UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RODERICK I. CAMPBELL,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL DYNAMICS GOVERNMENT SYSTEMS CORPORATION and RICHARD SCHNORBUS,<br><br>Defendants. | CIVIL ACTION No. 03-11848-NG |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS AND COMPEL PROCEEDINGS PURSUANT TO THE DISPUTE RESOLUTION POLICY

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., defendants General Dynamics Government Systems Corporation ("GDGS") and Richard Schnorbus ("Schnorbus") respectfully request that this Honorable Court stay further proceedings in this action and compel proceedings in accordance with GDGS's Dispute Resolution Policy. As grounds therefor, defendants state as follows:

### PROCEDURAL HISTORY

Plaintiff, Roderick I. Campbell ("Campbell"), was discharged from GDGS on December 30, 2002. On May 3, 2003, Campbell filed a charge with the Massachusetts Commission Against Discrimination ("MCAD") alleging that GDGS and Schnorbus discriminated against him on the basis of an alleged disability. On September 4, 2003, Campbell filed a lawsuit in Norfolk Superior Court, and later requested that the MCAD dismiss his charge on September 15, 2003. The MCAD dismissed Campbell's charge without prejudice as to the merits on September 17, 2003. GDGS removed the case to federal court on September 23, 2003.

## FACTUAL BACKGROUND

1. Plaintiff, Roderick I. Campbell ("Campbell"), was employed as an at-will employee by GDGS[1] from February 18, 2000 to December 30, 2002.

2. Effective May 1, 2001, GDGS implemented a Dispute Resolution Policy (the "DRP"). On April 30, 2001, GDGS notified employees of the creation of the DRP, via an announcement (the "Announcement") sent by electronic mail ("email"). The Announcement included two attachments, a flyer setting out in a question-and-answer format key provisions of the DRP (the "Flyer") and a handbook detailing the provisions of the DRP (the "DRP Handbook"). To read the Flyer and the Handbook, employees had only to click on the appropriate link in the Announcement. See Exhibit A, Affidavit of Paul Melanson, ("Melanson Aff."), ¶ 3.

3. The Announcement drew attention in the email to the importance of the DRP by advising employees to "review the enclosed materials carefully, as the DRP is an essential element of your employment relationship." See Melanson Aff., Ex. 1.

4. GDGS' Information Technology department kept a tracking log recording the time and date each employee viewed the Announcement. The log shows that Campbell viewed the Announcement at 1:56 p.m. on April 30, 2001. See Melanson Aff. ¶¶ 6-7.

5. The Flyer contains several labeled boxes setting out the terms of the DRP in simple language. A box entitled, "Who is covered?," informs employees that they will be covered if they "[c]ontinue [their] current employment after the effective date of the DRP's adoption." Another box entitled, "What claims are covered?," tells employees that "[e]mployment discrimination and harassment claims, based on, for example,…disability" are covered. See Melanson Aff., Ex. 2.

---

[1] On January 1, 2003, General Dynamics C4 Systems (GDC4S), formerly a business unit of GDGS, became General Dynamics C4 Systems, Inc. (GDC4S, Inc.). As a result, all employees who performed work under the GDC4S business unit, but were employees of GDGS, became GDC4S, Inc. employees. For the purposes of this litigation, General Dynamics C4 Systems, Inc. will be referred to as "GDGS".

17/504254.2 - 2 -

6. The Flyer emphasizes the exclusive nature of the DRP remedy by telling employees that the DRP is "the exclusive means of resolving workplace disputes for legally protected rights," and that "[i]f an employee files a lawsuit against the Company, the Company will ask the court to dismiss the lawsuit and refer it to the Dispute Resolution Policy." See Melanson Aff., Ex. 2.

7. The DRP Handbook included the text of Human Resources Policy 402: Dispute Resolution Policy, as well as sample claim forms and a plain-language, question-and-answer format discussion of the new policy. See Melanson Aff., Ex. 3.

8. The DRP states that "the continuation of employment by an individual shall be deemed to be acceptance of the DRP" and that "[n]o signature shall be required for the Policy to be applicable." See Melanson Aff., Ex. 3, § 9.0.

9. The DRP informs employees that the DRP would be the sole forum for covered claims and that it included an agreement to arbitrate. Section 7.0 states that "[t]he Policy is the sole and exclusive forum and remedy for all Covered Claims that are within its scope." Section 11.0 states that the DRP is "an agreement to arbitrate pursuant to the Federal Arbitration Act (citation omitted)." See Melanson Aff., Ex. 3, ¶¶ 7, 11.

10. The DRP also informs employees what types of claims would be covered. Section 4.1 provides that "Covered Claims are employment-related allegations between an individual Employee and the Company, its individual managers, and other current or former employees." Section 4.1 states that "Covered Claims include...[c]laims relating to involuntary terminations...[and] [e]mployment discrimination and harassment claims, based on, for example...disability." See Melanson Aff., Ex. 3, § 4.1.

11. The DRP outlines a comprehensive four-step process for resolving employment-related disputes. At Level One, a human resources representative seeks to informally resolve the dispute. At Level Two, a management review panel composed of 3 managers none of whom are the employees immediate supervisor seeks to resolve the dispute.

At Level Three, the dispute is submitted to non-binding mediation. At Level Four, the dispute is submitted to binding arbitration. See Melanson Aff., Ex. 3, §§ 6.1-6.4.

12. The DRP also includes detailed procedural safeguards regarding the conduct of arbitration and selection of the arbitrator. The parties are entitled to counsel, and are able "to make opening statements, to present the testimony of witnesses and to introduce exhibits through witnesses, to cross-examine the other party's witnesses and to make closing statements." The arbitrator is chosen by the parties, must have "a minimum of three (3) years' experience in the practice of employment law or in the arbitration of employment law claims or comparable experience," and can have "no financial interest in the Company or outcome of the arbitration, or other potential conflict of interest with either party." See Melanson Aff., Ex. 3, §§ 6.4.1-6.4.3.

13. The DRP provides the arbitrator with the authority to "grant any remedy or relief that would be available to an individual Employee had the claim been asserted in court for a Covered Claim" See Melanson Aff., Ex. 3, § 6.4.17.

14. Additionally, the DRP provides the parties with discovery tools. The parties to the arbitration are entitled to discovery of documents, disclosure of witnesses and documents, depositions and subpoenas for witnesses or documents. The arbitrator is empowered to resolve discovery disputes. See Melanson Aff., Ex. 3, §§ 6.4.7-6.4.13.

15. The DRP also makes it clear that the arbitrator is required to apply applicable substantive state and federal law. See Melanson Aff., Ex. 3, § 6.4.20.

16. The arbitrator is also required to issue a written opinion, which must contain *inter alia* "a summary of the Covered Claim arbitrated and decided...[and] the damages and/or other remedies/relief, if any." See Melanson Aff., Ex. 3, § 6.4.15.

17. The employee's cost of participating in arbitration under the DRP is minimal. GDGS pays administrative fees, the arbitrator's fees and travel expenses, and the cost of renting an arbitration hearing room. The employee is responsible for a $100 filing fee and his or her own expert and attorney's fees, unless the arbitrator awards such fees to the employee. See Melanson Aff., Ex. 3, § 6.4.21.

18. While GDGS retains the right to modify or terminate the DRP, it may do so only as to claims received by the Company after the effective date of the termination or modification and only after 30 days written notice to the employees. See Melanson Aff., Ex. 3, § 13.0.

19. Since its inception in 2001, GDGS has received 13 filings under the DRP: seven filings were resolved at Level One; one filing was resolved at Level Two; one filing is proceeding to mediation; and four filings were resolved at non-binding mediation. In one instance, after investigating a claim under the program, Human Resources ordered an entire department to undergo sensitivity training upon determining that employees had made insensitive remarks. See Exhibit B, Affidavit of Deanna Wenger ("Wenger Aff."), ¶ 5.

20. With the exception of the instant action, since May 2001, no GDGS current or former employee has pursued in court any claim which would be considered a "Covered Claim" as described in the DRP. See Wenger Aff., ¶¶ 5, 7.

21. In addition to the DRP, GDGS has enacted anti-discrimination policies for its employees. The policies include harassment, affirmative action, and equal employment opportunity. See Wenger Aff., ¶ 12., Ex. 4, 5 and 6.

22. GDGS's equal employment opportunity policy provides that GDGS will take appropriate disciplinary action when it determines that discrimination or discriminatory harassment has occurred. The policy also requires that supervisors ensure a workplace "free from any form of discrimination and harassment." See Wenger Aff., Ex. 5.

23. Campbell's counsel delivered a copy of his proposed MCAD filing to GDGS on May 13, 2003 alleging that GDGS had discriminated against Campbell. On May 15, 2003, GDGS informed Campbell's counsel of the DRP, requested that Campbell submit his claim in accordance with the DRP and informed Campbell's counsel that should Campbell submit his claims, GDGS would elect to proceed directly to mediation.

24. After Campbell filed a charge at the MCAD, GDGS repeatedly assured Campbell's counsel that if Campbell initiated proceedings pursuant to the DRP, that GDGS would proceed directly to Level 3 Mediation, in accordance with the provisions of the DRP.

25. Notwithstanding Campbell's acceptance of the DRP and GDGS' offers to proceed directly to mediation in accordance with the DRP, he seeks to litigate this matter in the courts.

## ARGUMENT

The FAA provides that federal courts shall stay proceedings in any action "referable to arbitration under an agreement in writing for such arbitration" until the arbitration is complete. 9 U.S.C. §3. When determining whether a civil action must be stayed pending arbitration, the Court must assess: (1) whether there is a written agreement to arbitrate; and (2) whether any of the issues raised are within reach of that agreement. See Bercovitch v. Baldwin Sch., Inc. 133 F.3d 141, 148 (1st Cir. 1998). In this case, there is a written agreement to arbitrate and Campbell's disability discrimination claim is properly subject to that agreement.

The Supreme Court has held that agreements to arbitrate statutory employment discrimination claims are enforceable. Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123-24 (2001); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) (federal age discrimination claim). Claims under both the ADA and M.G.L. c. 151B may properly be subject to arbitration. Bercovitch, 133 F.3d at 149-50 (noting that § 12212 of the ADA expressly encourages arbitration of disputes); Mugnano-Bornstein v. Crowell, 677 N.E. 2d 242, 247 (Mass. App. Ct. 1997). These cases reflect the strong federal policy favoring arbitration as a fair and economical way to resolve disputes between employers and employees. See Circuit City, 532 U.S. at 122-24. Where, as here, there is a written agreement to arbitrate Campbell's claims, the Court must

stay judicial proceedings and order submission of the dispute to proceedings in accordance with the DRP.

### 1. The DRP satisfies the requirement that there be an agreement to arbitrate between the parties because Campbell accepted its terms by continuing his employment after receiving notice of its terms.

The DRP is a written agreement to arbitrate between GDGS and Campbell. The existence of a written arbitration agreement is to be determined by application of general principles of state contract law. See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 19 (1st Cir. 1999); Brennan v. King, 139 F.3d 258, 265 (1st Cir. 1998). It is not necessary that the writing be signed by the parties. Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987) (citations omitted) ("[W]hile the Act requires a writing, it does not require that the writing be signed by the parties"). An undertaking to arbitrate will be enforced as to statutory discrimination claims where the employee receives at least a "minimal level of notice…that statutory claims are subject to arbitration." Rosenberg, 170 F.3d at 21. Campbell received notice that any statutory claims against GDGS would be subject to the DRP, and consented to this as a term of his employment.

Under Massachusetts law, the Announcement, the Handbook and the Flyer incorporated the terms of the DRP into Campbell's at-will employment when he continued to work after receiving notification of the DRP. Personnel policies may be incorporated into the employment agreement either expressly or by implication. See O'Brien v. New England Tel. & Tel. Co., 664 N.E.2d 843, 847-48 (Mass. 1996). This includes agreements to submit disputes to arbitration contained in personnel policies and manuals. See Brennan v. King, 139 F.3d 258, 264 (1st Cir. 1998); Corion Corp. v. Chen, No. Civ. A. 91-11792-Y, 1991 WL 280288 (D. Mass. Dec. 27, 1991).

Ample precedent exists for the proposition that personnel policies can be incorporated into the at-will employment by the employee's acceptance or continuation of employment. See, e.g., O'Brien v. New England Tel. & Tel. Co., 664 N.E.2d 843, 847-48 (Mass. 1996); see also Jackson v. Action for Boston Community Dev., Inc., 525 N.E.2d 411, 414-15 (Mass. 1988). Acceptance of terms in a personnel manual is in the nature of acceptance of an offer for a unilateral contract. O'Brien, 664 N.E.2d at 848. The employee's continuation of employment after receiving the personnel manual supplies the consideration necessary to support the contract. See id. at 847. A finding that a policy is part of the at-will employment contract is supported where an employee "signed [it], manifested assent to it, or acknowledged understanding of its terms, or if the employer called special attention to the manual." O'Brien, 664 N.E.2d at 848 (emphasis added). Where an employee would reasonably believe that the policy embodies conditions under which employment is to continue, the employee's continuing to work after being notified of the policy constitutes acceptance of the policy. See id.; see also Gebhard v. Royce Aluminum Corp., 296 F.2d 17, 19 (1st Cir. 1961) (observing that, as a matter of law, upon presentation of new terms and conditions of employment an at-will employee's options are to accept the terms or to quit). GDGS called special attention to the DRP by sending Campbell the Announcement and links to the DRP Handbook and the DRP Flyer. The Announcement advised Campbell to review the Handbook and Flyer carefully because DRP was an important element of his employment. The Tracking Record proves that Campbell opened the Announcement, and his subsequent continuation of employment manifested his assent to the new terms of his at-will employment contract.

This implementation of the DRP satisfied the First Circuit's notice requirements for employee arbitration programs as outlined in Rosenberg. In that case, the plaintiff had signed a

securities industry U-4 document that included an agreement to arbitrate disputes in accordance with the rules of the New York Stock Exchange. Rosenberg, 170 F.3d at 3-4. However, the plaintiff was never provided with a copy of the rules, which included a provision that she submit all employment-related disputes to arbitration. Id. at 19. Consequently, the court refused to require the employee to submit her age and gender discrimination claims against her employer to arbitration, holding that "there [must] be some minimal level of notice to the employee that statutory claims are subject to arbitration." Id. at 21. The court also noted that if the employee had received the rules, but did not read them, she would have been bound to arbitrate her claims. Id. at 21 n.17. Here, Campbell was given more than minimal notice that his claims would be subject to the DRP. GDGS notified him that the DRP was to become a part of his employment relationship, and provided him with the DRP Handbook and Flyer. These two documents stated that disability-related employment claims against GDGS would be subject to the DRP. GDGS also offered Campbell the opportunity to proceed with his claims through the DRP even after his counsel notified GDGS of Campbell's claims.

Moreover, the DRP fully addresses the concerns that the First Circuit expressed in Ramirez-De-Arellano v. American Airlines, Inc., 133 F.3d 89 (1st Cir. 1997). In that case, the plaintiff alleged wrongful discharge and retaliatory dismissal under the Fair Labor Standards Act and Puerto Rico law. Id. at 89. The district court granted summary judgment based in part on giving *res judicata* effect to the employer's internal dispute resolution procedure. Id. at 89-90. The First Circuit approved on different grounds, and observed in *dicta* that given (1) the adhesive nature of an employee handbook[2], (2) the handbook's disclaimer of intent to create a contract and (3) the power of the employer to unilaterally amend the handbook, it would be reluctant to

---

[2] This aspect of the decision is of questionable validity after Rosenberg. See 170 F.3d at 17.

characterize the employee's agreement to arbitrate as "voluntary and intentional." Id. at 90 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)). Unlike that handbook, the DRP does not contain language disclaiming creation of contractual obligations. To the contrary, it explicitly states that it is an agreement to arbitrate. Moreover, under the DRP, GDGS must provide 30 days notice of any modifications of the policy, and any such modifications apply only prospectively. Thus, there is no bar to enforcing the arbitration agreement in the DRP.

      2.    <u>Campbell's statutory disability discrimination claims are subject to arbitration under the DRP because its terms plainly include such claims and it provides an adequate forum for their fair and economical adjudication.</u>

Turning to the second step in the analysis, Campbell's claims fall within the scope of "Covered Claims" outlined in § 4.1 of the DRP. Courts are directed to determine coverage with a presumption of arbitrability that dictates resolution of the issue "with a healthy regard for the federal policy favoring arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983); see also Brennan v. King, 139 F.3d 258, 264 (1st Cir. 1998). A claim is covered "'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that that covers the asserted dispute.'" Peerless Pressed Metal Corp. v. International Union of Elec., Radio and Mach. Workers, AFL-CIO, 451 F.2d 19, 20 (1st Cir. 1971) (citation omitted).

Campbell's claim is covered by the DRP. His suit alleges that GDGS discharged him because he suffered from a disability, in violation of the Americans with Disabilities Act (the "ADA") and M.G.L. c. 151B. See Complaint, ¶¶ 1, 3. Section 4.1 of the DRP Handbook provides that "[c]laims relating to involuntary terminations...[and] [e]mployment discrimination and harassment claims, based on, for example...disability" fall within the scope of the DRP.

3. <u>The DRP satisfies any fair process concerns.</u>

Of course, arbitration provisions must be procedurally adequate. In <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, the Supreme Court rejected claims that the arbitration rules of the New York Stock Exchange ("NYSE") were inadequate to resolve the plaintiff's ADEA claims. 500 U.S. 20, 31-32 (1991). The NYSE's arbitration rules contained provisions to protect against bias, permitted the parties to engage in discovery and required arbitrators to issue written opinions. <u>Id.</u> Similarly, in <u>Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, the First Circuit approved of provisions of NYSE rules that empowered arbitrators to award attorney's fees and costs to employees who prevailed on statutory claims, and that did not require the employee to pay forum fees. <u>See</u> 170 F.3d 1, 16 (1999).

The arbitration provisions in the DRP contain stronger procedural protections and remedies. The DRP requires the parties to agree on an arbitrator and prohibits the use of arbitrators with financial interests in GDGS or other possible conflicts of interest. It allows the parties a wide range of discovery techniques, including mandatory disclosures, document requests, depositions and subpoenas for documents and witnesses. The arbitrator is required to apply the applicable federal and state law to the dispute. Additionally, the arbitrator is required to issue a written opinion and is empowered to provide the same remedies and relief that would be available in court as well as to award costs and attorney's fees to the employee. Finally, the DRP provides that GDGS bears the costs of arbitration, other than a $100 filing fee and the employee's legal fees and/or fees for the employee's experts, unless the Arbitrator awards reasonable experts' and/or attorneys' fees to the employee. Because it includes these provisions, the DRP provides an adequate forum for the fair resolution of Campbell's claim. <u>See Rosenberg</u>, 170 F.3d at 16; <u>Cole v. Burns Int'l Sec. Servs.</u>, 105 F.3d 1465, 1484-85 (D.C. Cir. 1997); ABA Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising out of the

Employment Relationship (1995). The DRP satisfies procedural requirements for a fair arbitration process.

### 4. GDGS's DRP has been successful in resolving employment disputes effectively and fairly.

In addition to the fact that, under controlling authority, the DRP is enforceable, there is yet another reason that Campbell's claim should be resolved by that process: it works. Since its inception in 2001, thirteen claims have been filed. Twelve of these claims have been resolved through the DRP process and one is pending mediation. None of the employees who participated in this process has seen fit to pursue his or her claim in court. Indeed, the majority of the complaints were resolved at the first level of the DRP process. Several others were resolved through non-binding mediation. Unfettered by the need to resolve the merits of grievances through strict judicial process, employment issues have been resolved at GDGS to the apparent mutual satisfaction of employer and employee[3]

Freed from the need to determine legal liability at its first three steps, the DRP has functioned as an effective part of GDGS' overall strategy to promote equal employment opportunity in the workplace. This strategy includes an anti-harassment policy, an affirmative action policy, and an equal employment opportunity policy. The effectiveness of the program was illustrated in one DRP claim that resulted in the provision of sensitivity training to an entire

---

[3] The need to determine liability in the litigation context may impair the eradication of discrimination in the workplace. Today, subtle, "second generation" forms of discrimination, as well as stereotype-based discrimination, present difficult problems of judicial identification and resolution. Cf. Centola v. Potter, 183 F.Supp.2d 403 (D.Mass. 2002) (examining discrimination based on sex stereotypes). Internal dispute resolution practices operating under judicial supervision, may be more effective at remedying the wrong without the need to assign formal, legal liability. See Susan Sturm, Second Generation Employment Discrimination: A Structural Approach, 101 Colum. L. Rev. 458, 475-84 (2001).

department. GDGS urges the Court to let it continue to work through its occasional workplace issues in an effective, non-judicial manner.[4]

> 5. The terms of the DRP are also enforceable as to Campbell's claim against Richard Schnorbus because the claims are inextricably related.

The terms of the DRP cover Campbell's claims against Schnorbus. The DRP itself says that claims against managers are subject to its provisions. This is consistent with federal law. Where an employee's claims against a manager are "inextricably related" to a claim against the employer, and the employer has an enforceable arbitration agreement with the employee, the claim against the supervisor is also subject to arbitration. See Myrick v. GTE Main Street Inc., 73 F.Supp.2d 94, 96-97 (D. Mass. 1999) (citing cases). Campbell's claim against Schnorbus is part and parcel of his claim against GDGS: Campbell alleges that Schnorbus was the agent of GDGS who discharged him because of his alleged disability. Campbell's claim against Schnorbus is also properly subject to arbitration under the DRP.

---

[4] The DRP has been enforced in other jurisdictions. See Akinnusotu v. Electric Boat Corp.and General Dynamics Corp.,C.A. No. 3:02cv1656(PCD), judgment and ruling at p. 3 (D. Conn. Feb. 28, 2003) attached as Exhibit C.

17/504254.2                                                            - 13 -

## CONCLUSION

For the reasons stated above, the Court should stay further judicial proceedings pending arbitration of Campbell's claims against GDGS and Richard Schnorbus.

Respectfully submitted,

**GENERAL DYNAMICS GOVERNMENT SYSTEMS CORPORATION AND RICHARD SCHNORBUS**

By their attorneys,

_____
Arthur Telegen (BBO # 494140)
Claudia T. Centomini (BBO # 553247)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

Dated: November 10, 2003

## CERTIFICATE OF SERVICE

I, Claudia T. Centomini, certify that on November 10, 2003, I served the foregoing document on plaintiff by causing a copy of the same to be delivered by hand to its counsel of record.

_____
Claudia T. Centomini

17/504254.2

- 14 -